STATE OF CONNECTICUT *v.* JUAN FALCON
(AC 24753)

McLachlan, Harper and Hennessy, Js.

Argued April 1—officially released July 5, 2005

*Stephanie L. Evans*, special public defender, for the appellant (defendant).

*Frederick W. Fawcett,* supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict,* state's attorney, and *Robert M. Brennan,* senior assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Juan Falcon, appeals from the judgment of conviction, following a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4).[1] The defendant claims that (1) the trial court improperly denied his motion for a mistrial, (2) the trial court improperly failed to suppress an identification of him by the victim, (3) the trial court deprived him of his right to confront certain state's witnesses and (4) that his conviction is not supported by sufficient evidence. We affirm the judgment of the trial court.

The jury reasonably could have found that shortly before midnight on July 30, 2002, the victim, Khondaker Jafar, was walking along a public street in Bridgeport, using his cellular telephone. The defendant and two other men approached and surrounded the victim. In an altercation that ensued, one or more of the men struck the victim in the face. The defendant held a gun against the left side of the victim's torso. The three men forcibly took the victim's telephone, wallet and keys and ran from the scene. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly denied his motion for a mistrial. We disagree.

During the cross-examination of the victim by the defendant's attorney, the victim testified that two detec-

---

[1] The court sentenced the defendant to a ten year term of imprisonment, execution suspended after four years, to be followed by a five year term of probation.

tives from the Bridgeport police department came to his apartment approximately one week after the incident. The victim testified that the detectives brought photographs with them and, during a ten minute visit, showed him photographs of the defendant as well as five or six other people.

Outside of the presence of the jury, the defendant's attorney informed the court that the state had not disclosed any information about that meeting despite the fact that the defendant had asked the state to disclose that type of information during discovery.[2] The prosecutor represented to the court that he did not have any knowledge of the meeting. The court then asked the victim several questions about the meeting. The victim briefly described his meeting with the detectives and stated that he identified the defendant's photograph, but that he was not able to identify any of the other individuals depicted in the photographs presented to him.

After a recess, the prosecutor called John Donovan, an inspector affiliated with the office of the state's attorney, to the witness stand. Donovan testified that at the request of the court and the prosecutor, he went to the Bridgeport police department to investigate whether a meeting between department detectives and the victim had occurred. Donovan testified that he discovered an "uncompleted supplemental investigation report" in a file that was begun by a detective as a follow-up to the department's initial investigation of the present case.

---

[2] The record reflects that on September 24, 2002, the court granted the defendant's motion to preserve evidence, thereby requiring the prosecutor and the Bridgeport police department to take "all reasonable steps to preserve" all records relating to the victim's complaint and the investigation related thereto, including "all photo trays, photo boards and photo arrays utilized in connection with any identification procedure in this case." On September 11, 2002, the defendant also filed a request for disclosure, which encompassed "[e]xculpatory information and materials" as well as any photographs that the prosecutor intended to present at trial.

Donovan testified that the detective who started that file, James N. DiPietro, was away from the department on an extended medical leave of absence and that he spoke with DiPietro about the file. Donovan testified that the supplemental file was not part of the file in the possession of the office of the state's attorney because DiPietro had not stored the supplemental file in the department's completed file.

Donovan brought the supplemental file to court and discussed its contents. The contents included a criminal investigation report,[3] the defendant's mug shot as well as several photographic arrays. Three of the arrays were identical, consisting of eight black and white photographs with the defendant's photograph in the seventh position in the array. The defendant's photograph was circled on each of the arrays, and the victim's handwritten initials and the date "9 Aug. 02" appeared next to the circled photograph on each array. One of the arrays consisted of smaller color photographs without any handwritten markings. The file also contained the defendant's arrest record, a record from the department of correction concerning the defendant and a copy of the original incident report concerning the reported robbery.

After Donovan left the witness stand, the victim further testified, outside of the presence of the jury, that the detectives showed him the defendant's mug shot as well as three identical photographic arrays. The victim recalled that he wrote his initials next to the defendant's

---

[3] DiPietro wrote the investigation report contained in the supplemental file. The report, dated August 9, 2002, specified the date and time that DiPietro met with the victim as August 9, 2002 at 10:30 a.m. It stated in relevant part: "I showed [the victim] a photo array consisting of eight males of similar description. [The victim] picked photo number seven as being one of the males that robbed him on the morning of [July 31, 2002]. [The victim] stated that the male pictured is the one that had the gun at the time of the incident." DiPietro specified that the photograph "is exclusively assigned to [the defendant] . . . ."

photograph on the arrays shown to him and that the detectives showed him the mug shot after he had identified the defendant in the arrays. The victim testified that the detectives did not show him any of the other contents of the file. The victim also testified that the photograph he circled was a photograph of the person who had robbed him, the defendant, and that the detectives had not suggested which of the photographs he should identify.

The defendant's attorney moved for a mistrial, arguing as follows: "I would move for a mistrial at this time based upon the way in which this came up to the defense, which puts the defense in jeopardy with reference to a second identification procedure that the defense had no knowledge of and should have been informed of at least during the motion to suppress identification at the time that was heard."[4] The court stated that it would treat the inquiry into the identification by the victim as a motion to suppress and would afford the defendant ample time to examine witnesses, outside of the presence of the jury, with regard to the matter. The defendant's attorney argued that the late disclosure of the detectives' meeting with the victim caused the defendant prejudice in that it precluded him from filing a motion to suppress prior to the commencement of the trial and from taking a different strategy in his presentation of evidence. The defendant's attorney conducted further examination of the victim regarding the meeting with the detectives as well as the identification of the defendant in the array.

The state then presented testimony from Paul Ortiz, a detective with the Bridgeport police department. Ortiz testified that he and DiPietro visited the victim at the

---

[4] Earlier, the defendant filed a motion to suppress the victim's identification of the defendant that occurred a short time after the robbery had occurred. The court denied the defendant's motion.

victim's residence on August 9, 2002, and spoke with him concerning the robbery. Ortiz recalled having shown the victim the signed arrays that were found in DiPietro's file. Ortiz testified that he and DiPietro showed the three arrays to the victim and that each time, the victim pointed to the defendant's photograph and indicated that the defendant was the man who had robbed him by circling the photograph and writing his initials near the circled photograph. Ortiz also testified that he compiled the arrays. He testified that using the defendant's mug shot, he found photographs of Hispanic males of the same age as the defendant and who looked similar to the defendant. Ortiz testified that he noticed that the defendant had a distinguishing physical characteristic in that he had a lazy left eye[5] and recalled that he could not find photographs of any other men within the defendant's age group who had a similar physical characteristic.

The defendant's attorney argued that the array was suggestive in that the defendant's photograph was the only photograph depicting an individual with a lazy eye. The defendant's attorney pointed out that Ortiz had testified that in the process of compiling the array, he was not able to find photographs of other individuals within the defendant's age group that possessed a similar physical characteristic. The defendant's attorney argued that this identification procedure could only have been used by the state "to unfairly bolster the identification that had already been rendered [by the victim] more than a week before." The victim had already testified that on the night of the robbery, he identified the defendant for the police.[6]

---

[5] That condition causes the defendant's left eye to turn noticeably to the left.

[6] The victim testified that after the defendant and his accomplices ran away from him, he walked to a pay telephone and dialed 911. Shortly after speaking with a police operator, the victim observed a police officer driving by in a police cruiser. The victim flagged down the officer, told him what had occurred and described the perpetrators. The victim testified that after

The court denied the defendant's motions for a mistrial and to suppress the identification. The court concluded that "the photographic array that was displayed was neither suggestive nor was it unreliable." Following the court's ruling, the defendant's attorney inquired with regard to the identification made to Ortiz and DiPietro and introduced the arrays into evidence. The prosecutor later elicited testimony from the victim and Ortiz concerning the victim's identification of the defendant in the arrays.

The defendant argues that the late disclosure of the victim's identification of the defendant by means of the arrays was harmful to his case and denied him a fair trial. The defendant describes the evidence regarding the identification as "highly exculpatory information"

---

he spoke with the officer briefly, the officer drove away, and he went back to his apartment. The victim later drove around the neighborhood, looking for his wallet. The victim testified that in the process of looking for his wallet, he observed the defendant standing among other people. The victim drove to a nearby gasoline station, called the police and reported that he had found one of the men who had robbed him. An officer arrived, the victim got in the back of his police cruiser and, from the back of the police cruiser, the victim identified the defendant at the place where he had observed him. That identification occurred approximately one hour after the robbery. The victim also identified the defendant in court, during direct examination.

Ferdinand Ferrao, an officer with the Bridgeport police department, testified that he was the officer whom the victim flagged down. Ferrao recalled that he spoke with the victim briefly, obtaining a description of the suspects and the victim's account of what had occurred. The victim told Ferrao that the man who had robbed him at gunpoint "was about [five feet, four inches tall], Hispanic male, dark complexion, dark eyes, wearing [a] gray T-shirt, short hair." Ferrao further testified that after the victim notified the police that he had observed the defendant, Ferrao met the victim, and the victim accompanied him in the police cruiser to the area where the victim recalled having seen the defendant. Ferrao drove the victim to that area, and the victim told Ferrao that the defendant was one of the men who had robbed him. Ferrao testified that the defendant matched the description that the victim had given him earlier that morning. The victim subsequently told Ferrao twice that the defendant was the man who had held a gun against his body and that he was "positive" in his identification. Ferrao testified that after the victim identified the defendant, he arrested the defendant.

and argues that "the state's key witness disclosed [this] exculpatory information in the middle of cross-examination, at a time so late that the defendant could not use it effectively." The defendant argues that by reason of his discovery requests, the prosecutor was obligated to disclose the evidence to him during discovery and that it was of no consequence whether the prosecutor actually knew of the existence of DiPietro's supplemental file.

The defendant argues: "[T]here is no question that the information withheld severely prejudiced the defendant and denied him his right to a fair trial and due process. Had this exculpatory information been disclosed to the defense, prior to the commencement of cross-examination, it would have allowed meaningful cross-examination of [the victim], the only witness who identified the defendant." The defendant points out that the victim testified that he was able to give only a general description of the defendant to the police shortly after the robbery occurred, but that after having the benefit of observing the defendant's mug shot, he testified that he had observed the defendant's distinguishing eye condition. The defendant argues that the late disclosure precluded him from attempting to impeach the victim in that regard. The defendant further argues that the late disclosure precluded him from interviewing and eliciting testimony from DiPietro. The defendant argues that the jury was left only with the account of the meeting given by the victim and Ortiz and that Ortiz testified that this was not his case and that he was only assisting DiPietro during the meeting. The defendant argues: "Had the defense known about Detective DiPietro and the photographic identification procedure, the defense would have had the opportunity to impeach [the victim] and Detective Ortiz. [The victim's] testimony would not have been so compelling, and the state would not have been able to unfairly bolster [the victim's]

identification of the defendant. When taken together, without the critical testimony of Detective DiPietro, the outcome of the trial is seriously unreliable and, thus, makes it reasonably probable that had the state not carelessly violated its constitutional duties, the result of the proceeding would have been different."

"While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court. . . . Put another way, [o]n appeal, the defendant bears the burden of establishing that there was irreparable prejudice to the defendant's case such that it denied him a fair trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Coltherst*, 87 Conn. App. 93, 99, 864 A.2d 869, cert. denied, 273 Conn. 919, 871 A.2d 371 (2005).

The crux of the defendant's claim is that the state failed to disclose exculpatory information. "In *Brady* v. *Maryland*, [373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to

punishment, irrespective of the good faith or bad faith of the prosecution. To establish a *Brady* violation, the defendant must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the defendant, and (3) it was material [either to guilt or to punishment]. . . . The United States Supreme Court . . . in *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), [held] that undisclosed exculpatory evidence is material, and that constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Citation omitted; internal quotation marks omitted.) *State* v. *Ross*, 269 Conn. 213, 304, 849 A.2d 648 (2004).

The defendant has failed to demonstrate that the state failed to disclose *exculpatory* evidence. "Exculpatory" has been defined to mean "[c]learing or tending to clear from alleged fault or guilt; excusing." Black's Law Dictionary (6th Ed. 1990). Here, the undisclosed evidence did not tend to clear the defendant from guilt; it tended only to incriminate him. DiPietro's file did not contain any statements by the victim that were inconsistent with the victim's earlier statements or with his prior identification of the defendant as the man who had robbed him. Instead, the file contained three photographic arrays, each of which reflected the victim's identification of the defendant.

The defendant similarly argues that by failing to disclose evidence concerning DiPietro's meeting with the victim, the state improperly withheld evidence that would have been useful to the defendant in impeaching critical state witnesses. "It is well established that impeachment evidence may be crucial to a defense, especially when the state's case hinges entirely upon

the credibility of certain key witnesses. . . . The rule laid out in *Brady* requiring disclosure of exculpatory evidence applies to materials that might well alter . . . the credibility of a crucial prosecution witness. . . . However, [e]vidence that may first appear to be quite compelling when considered alone can lose its potency when weighed and measured with all the other evidence, both inculpatory and exculpatory. Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest." (Citation omitted; internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 455, 758 A.2d 824 (2000).

The defendant argues that the late disclosure of evidence precluded him from conducting meaningful cross-examination of the victim concerning the contrast between his general description of the perpetrator's characteristics to Ferdinand Ferrao, an officer with the Bridgeport police department, immediately after the robbery and his detailed description of the defendant, which included a description of the defendant's eye condition, after his meeting with DiPietro, in which he observed the defendant's mug shot. The record belies that assertion, however, because it reflects that the defendant's attorney conducted an extensive cross-examination of the victim, which focused on the differences between the victim's initial description of the perpetrator to Ferrao and the victim's description of the perpetrator, in court, after his meeting with DiPietro.[7] The defendant's attorney also examined Ortiz, and

[7] During direct examination, the victim testified that he observed the defendant's eyes during the robbery and noticed that the defendant had "a problem in his left eye." The defendant's attorney elicited testimony from Ferrao that the victim had not told him about the defendant's eye condition and that he would have considered such a physical characteristic "something important to know." The defendant's attorney also elicited testimony from the victim that he had not described the defendant's eye condition to Ferrao as part of his description of the physical characteristics of the suspects of the robbery. The defendant's attorney specifically asked the victim during cross-examination if it was accurate to state that prior to seeing the photo-

attempted to impeach the victim on the basis that the victim and Ortiz testified differently concerning where in the victim's apartment the victim viewed the arrays. Finally, to the extent that the defendant argues that DiPietro would have provided him abundant fodder for cross-examination, such argument is purely speculative. Donovan testified that DiPietro was out of work on an extended absence. The record does not reflect that the defendant requested a continuance or took any steps to compel DiPietro to testify.

Furthermore, in determining whether the late disclosure deprived the defendant of a fair trial, we are mindful of the undisputed evidence of the victim's identification of the defendant during the early morning hours of July 31, 2002, immediately after the robbery, and days before DiPietro visited him and showed him the photographs at issue. See footnote 6. The victim testified that he observed the defendant during the robbery and while he was looking for his wallet after the robbery. It is uncontroverted that the victim contacted the police and that he, later, from the back of a police cruiser, positively identified the defendant as the man who had held a gun against him during the robbery. This identification to police that led to the defendant's arrest was untainted by the state's failure to disclose evidence concerning DiPietro's meeting with the victim and provided a sufficient basis both for the defendant's arrest and conviction. That being the case, the second identification to the police was merely cumulative identification evidence. Accordingly, we conclude that the defendant has failed to demonstrate that there is a reasonable probability that had the state timely disclosed the evidence of DiPietro's meeting with the victim, the

---

graphs that DiPietro showed to him of the defendant, he had ever told the police that the defendant had "a bad eye." The defendant replied affirmatively. The defendant's attorney also drew attention to those facts during his closing argument to the jury.

outcome of the trial would have been any different. The court's denial of the motion for a mistrial reflected a sound exercise of its discretion.

## II

We next turn to the defendant's claim that the court improperly failed to suppress the victim's identification of him by means of the photographic arrays. We disagree.

The facts that underlie the defendant's claim are set forth in part I. The court rejected the defendant's claim that the arrays were suggestive and that the identification was unreliable. The victim identified the defendant during direct examination, and the court subsequently permitted the jury to hear evidence concerning the victim's identification of the defendant.

"[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . The defendant bears the burden of proving that the identification procedures that resulted in his identification violated his due process rights. . . . To succeed, the defendant must show first [that] the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . If the procedures used to identify the defendant were not unnecessarily suggestive, we need not independently analyze whether the identification was reliable." (Citations omitted; internal quotation marks omitted.) *State*

v. *Johnson*, 82 Conn. App. 777, 788–89, 848 A.2d 526
(2004).

The identification that led to the defendant's arrest
and conviction is not at issue in this appeal. It occurred
shortly after the victim was robbed when the victim
identified the defendant from the back of Ferrao's
police cruiser. See footnote 6. Nonetheless, the defen-
dant argues that the second identification of him by the
victim to the police should have been suppressed. We
address the defendant's claim because the defendant
argues that this second identification in some measure
bolstered the strength of the victim's identification of
him.

The defendant argues that the identification proce-
dure was unnecessarily suggestive and that the resulting
identification was unreliable because the victim testi-
fied that he had some difficulty observing the perpetra-
tors of the crime, the victim did not tell Ferrao that
one of the perpetrators had a lazy eye, the evidence
suggests that the victim did not tell anyone about the
defendant's lazy eye until after the detectives showed
him the array and the detectives showed the victim
the defendant's mug shot separate from the array. The
defendant also argues that the identification should
have been suppressed because the defense "was
unfairly surprised" by it and "was clearly unprepared
to meet it . . . ." Finally, the defendant argues that in
light of the victim's identification of him shortly after
the robbery, "[t]here was no need for the police to
compile a photographic array for the victim to see."

The evidence is uncontroverted that the detectives
showed the victim the defendant's mug shot, separate
from the array, only after the victim positively identified
the defendant's photograph in three arrays. The victim's
testimony is uncontroverted that the detectives did not
suggest which photograph depicted the defendant.

There is no evidence that the detectives even told the victim that a suspect's photograph was in the array. There is no evidence that the victim was hesitant or uncertain when he selected the defendant's photograph. After a visual review of the arrays, we agree with the court that the arrays were not unnecessarily suggestive.

The defendant's arguments that the victim had difficulty observing the perpetrators, that the victim did not tell Ferrao that the defendant had a lazy eye or that the victim did not tell anyone about the defendant's lazy eye until after he saw the arrays are not persuasive because they do not relate to the reliability or the fairness of the identification. If anything, those arguments were fodder for the jury's consideration in evaluating the strength of the victim's identification. Further, the defendant's claim of surprise at learning about the arrays during trial does not relate to the fairness of the identification procedure employed.[8]

The defendant's assertion that the identification was unfair because it followed the victim's positive identification of the defendant shortly after the robbery is unsupported by law or reason. The defendant properly points out that the victim's initial identification of the defendant following the robbery made the second identification to the detectives unnecessary. That fact, however, does not persuade us that the second identification was by any means unfair. There is nothing that precluded the police from presenting the arrays to the victim during their continuing investigation of the

[8] The defendant also has failed to support his claim that the court should have excluded the evidence as being unduly prejudicial because he was "clearly unprepared to meet it . . . ." The defendant, prior to trial, was aware that the victim had identified him after the robbery. The second identification to police, as the defendant points out, "clearly [was] unnecessary" to the state's case. Under those circumstances, the defendant is unable to demonstrate that this relevant evidence was of such a nature that its admission caused him undue prejudice.

crime. We fail to see how the defendant's second identification was somehow tainted by the first identification. For those reasons, we conclude that the court properly denied the motion to suppress.[9]

## III

The defendant next claims that the court infringed on his right to confront certain state's witnesses. We disagree.

"[T]he sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination. . . .

"Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the

---

[9] The defendant also claims that the court should have suppressed the victim's in-court identification of him. See footnote 6. The defendant did not move to suppress the victim's in-court identification and seeks review of that aspect of his claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine, codified in Practice Book § 60-5. The defendant asks this court to presume, as the defendant presumes, that the victim's in-court identification was based on his observation of the defendant's mug shot rather than on firsthand observations of the defendant made during the robbery, during his search for his wallet and when he identified the defendant from the back of Ferrao's police cruiser. The defendant's claim is also based on his presumption that the police acted improperly when they presented the arrays to the victim. The court did not make any findings of fact concerning that claim, and we cannot make such findings. There is no record adequate for review under *Golding*.

Plain error review is also not warranted. The in-court identification complained of followed a firsthand identification immediately after the incident. That initial identification was sufficient, led to the defendant's arrest and conviction, and was unrelated to the subsequent identifications of which the defendant complains. Under those circumstances, we fail to see how the in-court identification or the identification of the defendant by means of the arrays in any way affected the outcome of the trial.

excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial. . . . The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . .

"We traditionally apply a two part analysis to determine whether a party has been deprived of effective cross-examination. First, we determine whether the defendant received the minimum opportunity for cross-examination of adverse witnesses required by the constitution. . . . If so, we then consider whether the trial court's restriction of cross-examination amounted to an abuse of discretion under the rules of evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Morgan*, 70 Conn. App. 255, 268–69, 797 A.2d 616, cert. denied, 261 Conn. 919, 806 A.2d 1056 (2002).

The defendant argues that because the state failed to disclose any information about DiPietro prior to trial, he was "not able" to call DiPietro as a witness. The defendant further argues that before the court could rule on the admissibility of the victim's identification of him to DiPietro and Ortiz, it was necessary for the court to hear testimony from DiPietro. The defendant also argues that he could not effectively cross-examine the victim and Ortiz, concerning the presentation of the arrays, without the benefit of DiPietro's testimony.

The record reflects that after the victim testified that he had met with DiPietro, the defendant's attorney indicated that it would be "necessary" for DiPietro and Ortiz to be available for the court's hearing on the motion to suppress evidence concerning the identification by means of the array. The defendant did not make any

motion concerning DiPietro, and the court indicated that it would permit the parties to present whatever evidence they wanted to present concerning the motion. The state presented testimony from Donovan that DiPietro was away from work on an "extended absence" necessitated by back surgery. The state did not call DiPietro to testify. The defendant did not at any time request a continuance or take steps to compel DiPietro to testify.

The record does not reflect that the court restricted the defendant's right to cross-examine the victim or Ortiz or that it in any way precluded the defendant from eliciting testimony from DiPietro. We recognize that the defendant was unaware of DiPietro's importance until the victim testified at trial about his meeting with DiPietro. Nonetheless, the court did not preclude the defendant from eliciting testimony from DiPietro at that time. The court ruled on the motions, having heard the evidence that the parties chose to present. Accordingly, the defendant's claim is without merit.

The defendant next argues, for the first time on appeal, that he was deprived of his right to confront the victim and Ortiz because "the entire proceedings were unfairly disjointed and very difficult for a jury to follow." The defendant also argues that the state repeatedly raised objections at trial that were without merit.[10] Finally, the defendant argues that "the entire proceedings lacked any structure and affected [his] ability to effectively cross-examine the state's key witnesses."

The record reflects that after the victim testified that he met with DiPietro and Ortiz, the court granted the

[10] The defendant claims that after the suppression hearing, the prosecutor objected to several questions defense counsel asked the victim on the ground that they had already been asked and answered. The defendant claims that the prosecutor confused testimony elicited during the evidentiary hearing on the motion to suppress with testimony elicited before the jury.

defendant's request to excuse the jury and conducted the proceedings discussed previously. After the court denied the defendant's motions for a mistrial and to suppress the evidence concerning the arrays, the court permitted the defendant to continue his cross-examination of the victim before the jury.

The next day, after the parties concluded their examinations of the victim, the state called Ferrao to the witness stand. During the defendant's cross-examination of Ferrao, the court permitted the prosecutor to call Ortiz to the witness stand because Ortiz had indicated that he would not be available to testify during certain days of the trial.[11] The parties examined Ortiz and, after he left the witness stand, the defendant's attorney resumed his cross-examination of Ferrao.

The defendant's claim, unsupported by citation to relevant legal authority, is without merit. The defendant has not demonstrated that the court restricted his ability to cross-examine any witness or that the presentation of the evidence during his trial was inherently detrimental to his ability to cross-examine witnesses.[12] The defendant has not demonstrated that the delay in the presentation of the evidence related to his objection to certain evidence or affected his ability to cross-examine the victim. The defendant did not object when the court granted the state's request to interrupt his cross-examination of Ferrao so as to permit Ortiz to testify out of order. The defendant has not demonstrated that the fact that the court permitted the state to call a witness out of order in any way affected his ability to cross-examine Ortiz or Ferrao. The interruption of cross-

---

[11] Ortiz testified at the suppression hearing the previous day that he would be traveling to Florida later in the week.

[12] The record reflects that the court, in general terms, promptly communicated to the jury the reasons why a delay occurred during the defendant's cross-examination of the victim as well as why it permitted the state to call Ortiz during the defendant's cross-examination of Ferrao.

examination did not, in any way we can perceive, amount to a preclusion of cross-examination. Finally, the defendant has not demonstrated that the fact that the prosecutor raised objections that the defendant deemed improvident precluded him from eliciting any testimony at trial.

IV

Finally, the defendant claims that the jury's verdict was not supported by sufficient evidence. We disagree.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Gary*, 273 Conn. 393, 405, 869 A.2d 1236 (2005).

The defendant argues that the evidence was insufficient because the jury could not properly have relied on the victim's testimony. The defendant requests that this court "declare [the victim's] identification testimony incredible as a matter of law." The defendant argues that the victim inconsistently described the perpetrator of the crime, that the victim's identification of him was uncorroborated, that Ortiz contradicted the victim's testimony concerning where in the victim's apartment he viewed the arrays and that it is "abundantly clear from all of the facts in the record" that the victim misidentified the defendant shortly after the robbery occurred. The defendant posits that because the conviction rested on the victim's testimony, the evidence was insufficient.

Our resolution of the defendant's claim requires little discussion. The defendant disregards the role of the

jury in weighing the evidence and its role, not ours, in evaluating the credibility of witnesses. "This court will not revisit credibility determinations. Whether [a witness'] testimony [is] believable [is] a question solely for the jury. It is . . . the absolute right and responsibility of the jury to weigh conflicting evidence and to determine the credibility of witnesses." (Internal quotation marks omitted.) *State* v. *McFarlane*, 88 Conn. App. 161, 169, 868 A.2d 130, cert. denied, 273 Conn. 931, 873 A.2d 999 (2005). There is no basis on which the victim's testimony was inadmissible because it was uncorroborated or because the victim and Ortiz testified inconsistently with regard to where in the victim's apartment the victim viewed the arrays. The defendant, through vigorous cross-examination and argument, attempted to discredit the victim's identification of him. Those efforts failed, and the jury credited the victim's testimony. The victim's testimony provided an evidentiary basis for the conviction. The defendant has not persuaded us that it was unreasonable for the jury to have relied on the victim's unambiguous identification of him as the perpetrator of the crime. Accordingly, the defendant's claim fails.

The judgment is affirmed.

In this opinion the other judges concurred.