******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* TIMOTHY PHILLIPS
(AC 37183)

Gruendel, Sheldon and West, Js.

*Argued April 8—officially released October 13, 2015*

(Appeal from Superior Court, judicial district of
Hartford, Dewey, J.)

*John L. Cordani*, *Jr.*, assigned counsel, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with
whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Timothy Phillips, appeals from the judgment of conviction, rendered after a jury trial, of three counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), and three counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2), arising from an incident involving a minor victim, K.[1] On appeal, the defendant claims that the trial court erred by (1) failing to admit, as substantive evidence, certain statements by mandated reporters of child abuse to the Department of Children and Families (department) concerning K's character for untruthfulness, which were set forth in a department report concerning its investigation of the incident; (2) failing to disclose evidence to the defense that K had also made allegations of sexual assault against another individual, which assertedly would have aided the defendant in preparing and presenting his defense at trial. We affirm the judgment of the trial court.

The following facts, which reasonably could have been found by the jury, are necessary to our consideration of the defendant's claims. At the time of the incident, K, a twelve year old girl with cognitive limitations,[2] was living with her grandparents in Windsor. The defendant befriended K's grandfather in 2009 or 2010 when they met at a car dealership in Windsor. Thereafter, the defendant and the victim's grandfather worked on cars together, and the defendant occasionally spent time at the home of K and her grandparents.

On Saturday, June 18, 2011, the defendant asked K's grandfather if he could take K to a family picnic. K's grandfather felt comfortable with the defendant, and so he agreed. The defendant, however, did not take K to a family picnic. Instead, he took her out to eat at a Chinese restaurant in Manchester, where K's special education paraprofessional, Paula Glofka, was dining with her family. K approached Glofka, then hugged her and told her that she was at the restaurant with a friend. When Glofka introduced herself to the defendant, she noted that he appeared to be "tense or nervous."

After dinner, the defendant took K to his trailer in Hartford. There, the defendant sexually assaulted K on his couch as they watched a movie. The defendant told K that he liked her and he "wanted to do stuff to [her]." The defendant first removed K's pants and underwear and performed oral sex on her. The defendant then inserted his penis into her vagina and anus. K told the defendant that it hurt, and that she wanted him to stop, but he did not stop. After assaulting K, the defendant brought her home. K did not tell her grandparents what had happened. The next day, the defendant returned to K's house, and he stayed for a short time.

On the following Monday morning, shortly after school started, K approached Glofka and told her that

she had had "S-E-X" with the defendant. Glofka promptly notified the school social worker, Karen Henry, who contacted the department. In Henry's presence, K drew a picture of two stick figures, representing herself and the defendant, to indicate where on her body the defendant had touched her with his penis. A medical examination was performed that same day at the Connecticut Children's Medical Center by Dr. Zoe Casey. Casey discovered a linear, one centimeter tear on the interior of K's vagina that was consistent with sexual intercourse. K reported to Casey that she was experiencing burning with urination, and that she was suffering from a bitten nipple.

Thereafter, K underwent a forensic interview at the Greater Hartford Children's Advocacy Center at Saint Francis Hospital and Medical Center. A video recording of the interview was shown to the jury at trial. In the interview, K gave a full description of the defendant's assaultive conduct toward her in his trailer. She also described the trailer. K stated that the exterior of the trailer was white with blue and brown stripes. As for the interior of the trailer, K stated that the couch where the defendant had assaulted her was red and of the sort that "flips back into a bed." Opposite the red couch, she stated, there was a television and another couch, which formed an "aisle" in the center of the main living area. Portions of K's interview varied from her testimony at trial. In the interview, K alleged, for the first time, that the defendant had assaulted her a second time, on Sunday, June 19, at her home. The police, however, were unable to substantiate that allegation, and K later testified that she did not in fact have contact with the defendant after Saturday, June 18.

Detective Josh Lewis of the Hartford Police Department was assigned to investigate the assaults. Lewis drove K and her grandmother around the area in Hartford where he believed that the assaults may have occurred, based on K's account. K directed Lewis to the defendant's trailer, which was parked behind an industrial building located on North Main Street. The appearance of the defendant's trailer was consistent with K's previous description of it.

Forensic testing was performed on the clothing that K had worn on the day of the incident. Screening tests revealed the presence of amylase, an enzyme that is found in human saliva, on the interior panel of the crotch of K's underpants. Two cuttings were removed from the interior panel and sent to the state forensic laboratory for DNA testing. A DNA sample extracted from the biological material on one of the cuttings was tested using Y STR DNA testing to determine whether the defendant was a possible contributor to that sample. The result of such testing was that the defendant was included as a possible source of the DNA.[3] The reported statistical significance of the match was one in 1557 in

the African American population, one in 1922 in the Caucasian population, and one in 1004 in the Hispanic population.

On the basis of such evidence, the jury convicted the defendant of three counts of sexual assault in the first degree and three counts of risk of injury to a child.[4] The court rendered judgment in accordance with the jury's verdict by imposing a total effective sentence of thirty-five years incarceration. This appeal followed.

## I

The defendant first claims that the court erred in refusing to admit, as substantive evidence, a department report containing statements made by certain mandated reporters of child abuse concerning K's character for untruthfulness. Specifically, the defendant directs our attention to portions of the department report reciting statements by K's paraprofessional and the school social worker, Glofka and Henry, respectively, that (1) K is not always truthful; (2) K had a reputation for making up stories, and (3) K had fabricated a story about being chased through the school by an unknown man. The defendant contends that Glofka and Henry, as mandated reporters, had a statutory duty to report the defendant's alleged assaults, and thus their statutorily mandated statements were admissible, in their entirety and without limitation as to their use, under the business records exception to the rule against hearsay. The state argues that the defendant's claim was waived. We agree with the state.

The following additional facts are necessary for our discussion. On the first day of trial, Glofka testified concerning K's disclosure and the subsequent reporting of K's allegations against the defendant to the department. On cross-examination, defense counsel questioned Glofka as follows:

"[Defense Counsel]: Isn't it true ma'am, that . . . when you talked to [the department], you told them that [K] is such a habitual liar that you can't tell if she's telling the truth or she wasn't telling the truth?

"[Glofka]: No one told me that and I have not heard that.

"[Defense Counsel]: Okay. You haven't heard that? You didn't say that to anybody at all?

"Glofka: No."

Defense counsel refreshed Glofka's recollection with a copy of the department report, and asked her again, "[A]re you saying that you never told anybody else that [K] was a liar?" Glofka responded: "No."

Defense counsel pursued a similar line of questioning during his cross-examination of Henry:

"[Defense Counsel]: And did you talk to the person [from the department] and tell them that [K's] a liar,

her grandparents have their hands full with her?

"[Henry]: Did I say that? I mean, I don't know—she's a handful.

"[Defense Counsel]: Okay.

"[Henry]: She's a handful.

"[Defense Counsel]: Okay. And she isn't always truthful about things.

"[The Court]: Is that a question?

"[Defense Counsel]: Yes.

"[Henry]: I really can't answer that yes or no. Does she tell sometimes stories? I don't know if it's telling stories. She'll get—she wants my attention, like so and so just told her that  . . . she looked ugly. You know, you're like, could you please ignore it, and that's one of my goals, you know what I mean, to her is—you know, please bring to the attention what's important.

"[Defense Counsel]: Okay. I understand that, ma'am. But did you tell [the department] that she isn't always truthful?

"[Henry]: I can't—you know what, I can't—I really don't recall that. Does she not tell the truth? I don't know, to tell you the truth.

"[Defense Counsel]: Okay. Not a problem."

On the second day of trial, defense counsel informed the court that he had subpoenaed a representative from the department to lay a foundation for the admission of the department report as a business record. Defense counsel claimed that the department report was admissible under *State* v. *Palozie*, 165 Conn. 288, 295, 334 A.2d 468 (1973). More specifically, defense counsel argued that the statements of K's teachers contained in the report, made under circumstances in which they had a duty to report their observations, were admissible under the business records exception to the rule against hearsay. Additionally, the defendant contended that the statements in the department report were admissible under the Connecitcut Code of Evidence § 6-10[5] as prior inconsistent statements. Specifically, defense counsel stated: "[U]nder the Connecticut [Code] of Evidence [§] 6-10, these particular witnesses, *the ones I'm looking* [*to*] *admit evidence against*, which is . . . Henry and . . . Glofka, they were shown the statements, they denied making the statements and, as such, because of their  . . . denial—then the defense is able to get into extrinsic evidence of prior inconsistent statements." (Emphasis added.)

After hearing arguments from both sides, the court stated that it would review the department report in camera and limit its consideration of its admissibility "to whether or not those two [witnesses] made a prior inconsistent statement, and that's all." The defendant

did not object to the court's review of the department report for that limited purpose.

Thereafter, the court, after reviewing the department report and *State* v. *Palozie*, supra, 165 Conn. 288, agreed to admit certain portions of the department report as evidence of prior inconsistent statements by Henry and Glofka.[6] Thus, the jury received evidence that "the caller" in the report, Henry, had made statements to the department that the victim is not always truthful, and that Glofka had reported to the department that the victim is known to make up stories. The court gave a limiting instruction regarding the proper use of such evidence, informing the jury that it could only use the evidence in assessing Glofka's and Henry's credibility. The defendant did not object to this instruction. The jury was similarly instructed in the court's final charge that it should "consider such evidence as you would any other evidence of inconsistent conduct in determining the weight to be given to the testimony of the witness in court." Again, the defendant did not object to the court's instruction.

On appeal, the defendant claims that the court erred in admitting limited portions of the department report as prior inconsistent statements. He further argues that the court's instructions improperly restricted the jury's use of the statements to assess Glofka's and Henry's credibility, and thereby prevented the jury from using the statements to assess the victim's credibility. That restriction, he now claims, "vitiated the only purpose of this evidence," and thus deprived him of his constitutional right to present a defense.

The defendant's claims are inconsistent with his conduct at trial. The defendant sought to admit the proffered statements on two alternative bases: as business records under the business record exception to the hearsay rule, *or* as prior inconsistent statements. When the court indicated that it would consider the admissibility of the evidence for the latter purpose, the defendant did not object. Accordingly, when the court gave its instructions limiting the jury's use of the evidence, both in the middle of trial and in its final charge, the defendant did not object. As a result of his pursuit of this trial strategy, the defendant sought successfully to have portions of the department report admitted to contradict Henry's and Glofka's statements at trial.

Against this background, having sought, then acquiesced in, the introduction of the subject statements for limited purposes, the defendant cannot now object to the court's ruling so admitting them or instructions confirming the limited scope of their permissible use. "We do not look with favor on parties requesting, or agreeing to, an instruction or a procedure to be followed, and later claiming that that act was improper." (Internal quotation marks omitted.) *State* v. *Reynolds*, 118 Conn. App. 278, 305 n.7, 983 A.2d 874 (2009), cert.

denied, 294 Conn. 933, 987 A.2d 1029 (2010). The defendant proposed that the court admit the department report as a prior inconsistent statement, thus he cannot now claim error, constitutional or otherwise, on appeal. See *State* v. *Coleman*, 304 Conn. 161, 174–75, 37 A.3d 713 (2012) (defendant implicitly waived claim of constitutional error when he requested that the court omit language in the jury charge " 'or' " add further instructions highlighting additional circumstances by proposing "equally satisfactory alternative forms of relief"). We deem this claim waived, and, therefore, we decline to review it.

## II

The defendant also claims that the trial court's failure to disclose certain confidential records violated his fourteenth amendment rights under *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987), and *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).[7] We disagree.

The following facts are relevant to our resolution of the defendant's claim. Approximately seven months after the defendant's arrest, K made allegations that another individual had sexually assaulted her. In connection with those allegations, K underwent a forensic interview at the Greater Hartford Children's Advocacy Center at Saint Francis Hospital and Medical Center, in the course of which she disclosed the identity of her alleged assailant and gave a detailed account of the alleged sexual assault. Six days before trial, the prosecutor informed the court and defense counsel that he had subpoenaed a video recording and a summary report of the forensic interview, and that, although he did not believe that the records were exculpatory or otherwise discoverable, he had obtained a waiver from K's grandparents for the court to review them in camera. Defense counsel concurred with the prosecutor that the proposed in camera review of the records was appropriate, but stated that the evidence should be disclosed to the defense in any event because the contents of the records, as described by the prosecutor, were exculpatory.

Thereafter, the court reviewed the records in camera and concluded that "[t]here was nothing in [them] that would require additional discovery." After the state had rested, defense counsel reasserted his position that the records should be disclosed to the defense, arguing that evidence of another sexual assault complaint by K tended to show that she was "in the habit of making complaints." The court disagreed, stating that multiple allegations of sexual assault merely indicated that K was a "multiple victim."

As a preliminary matter, we set forth the relevant legal principles. "The defendant has a right to the disclosure of exculpatory evidence under the due process

clauses of both the United States constitution and the Connecticut constitution." (Internal quotation marks omitted.) *State* v. *Caracoglia*, 134 Conn. App. 175, 185, 38 A.3d 226 (2012). In *Pennsylvania* v. *Ritchie*, supra, 480 U.S. 56, 58, the United States Supreme Court, relying on the duty of the prosecution to disclose exculpatory evidence under the due process clause of the federal constitution as recognized in *Brady* v. *Maryland*, supra, 373 U.S. 83, held that the defendant was entitled to have the trial court conduct an in camera inspection of a confidential child protective services agency file to determine if it contained material exculpatory evidence, and if so, to turn it over to the defense.[8] Under *Ritchie*, "if the trial court discovers material exculpatory evidence in the course of an in camera inspection, it has a duty to disclose it to the defense and the defendant has a due process right to its disclosure." *State* v. *Harris*, 227 Conn. 751, 762, 631 A.2d 309 (1993).

The test of material exculpatory evidence is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). The United States Supreme Court has explained: "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles* v. *Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (quoting *United States* v. *Bagley*, supra, 473 U.S. 678).[9]

The defendant argues that the evidence is material and exculpatory, and, thus, that it should have been disclosed, for the following reasons. If K's allegations against the unknown individual were false, the confidential records constitute impeachment evidence that should have been disclosed to the defense. Alternatively, if the allegations were true, and K was sexually assaulted by another individual, the evidence tends to support an alternative explanation for the presence of the one centimeter tear on the interior of K's vagina. With these factors in mind, the defendant urges this court to examine the confidential records to determine whether he was prejudiced by the court's denial of access to them.[10]

On appeal, this court conducts an independent review of the confidential records to determine whether they contain exculpatory evidence that is material under *Brady*. See *State* v. *Boyd*, 89 Conn. App. 1, 26, 872 A.2d 477 (2005), overruled in part on other grounds, *State* v. *Kemah*, 289 Conn. 411, 957 A.2d 852 (2008). We limit our discussion concerning the contents of the records

to protect the victim's confidentiality. See *State* v. *Francis*, 70 Conn. App. 571, 577–78, 800 A.2d 574 (2002) (in reviewing confidential records, we state "only that which is necessary to illuminate our decision" in order to protect victim's right to keep privileged records confidential), rev'd on other grounds, 267 Conn. 162, 836 A.2d 1191 (2003). We have reviewed the records and conclude that there is some information contained in them that is exculpatory. We further conclude, however, that it is not probable that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

The defendant argues that the exculpatory value of the evidence was particularly significant in this instance, and should have been disclosed, because K is a child witness with limited intellectual abilities; K had made and retracted another admittedly false allegation of sexual assault—more particularly, that the defendant sexually assaulted her a second time on Sunday, June 19; and there was evidence before the jury that K was not always truthful. He further argues that the evidence should have been disclosed "as proof of an alternat[ive] source of [K's injury]," specifically, the one centimeter tear in K's vagina. See General Statutes § 54-86f (1) (prior sexual conduct admissible to show whether defendant was source of injury). We disagree that these factors change the calculus here, given the substantial corroborating evidence of the defendant's guilt. "Materiality is not determined in a vacuum; rather, it must be made in the context of all the evidence adduced at trial." *State* v. *Jaynes*, 36 Conn. App. 417, 423, 650 A.2d 1261 (1994), cert. denied, 233 Conn. 908, 658 A.2d 980 (1995).

The evidence established that the defendant sought K's grandfather's permission to take K out for the stated purpose of bringing her to a family picnic. Glofka then observed K out to eat with the defendant at a different location, particularly, a Chinese restaurant in Manchester. Glofka recalled that the defendant appeared nervous. K testified that, after dinner, the defendant took her to his trailer. The evidence established that K was able to lead investigators directly to the defendant's trailer, which was parked on the rear side of an industrial building in Hartford, and could describe its interior in detail.

K further testified that the defendant assaulted her, "[l]icking" her, penetrating her vaginally with his penis, and doing "the [s]ame thing what he did to the front doing the same to back." The physical evidence supported K's account. Casey, the physician who examined K, testified that she discovered a one centimeter tear on the interior of K's vagina. Casey further testified that the tear was unlikely to have resulted from an external injury; instead, it was an internal abrasion of the sort that was consistent with having been caused by forced

sexual intercourse. Finally, and most significantly, the state presented evidence that male DNA matching the defendant's DNA was discovered in the crotch of the underpants K was wearing on the day of the alleged assault. The record before the trial court supported no reasonable alternative explanation for the presence of such incriminating evidence in the minor victim's underpants.

A defendant asserting a *Brady* claim on appeal shoulders a heavy burden. He must show "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (Internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 700, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006). Having undertaken a careful review of the confidential materials and the trial record, we conclude that the defendant has not made such a showing, and, thus, that he cannot prevail on his claim.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the complainant or others through whom the complainant's identity may be ascertained. See General Statutes § 54-86e.

[2] K has an IQ of 72 and suffers from multiple learning and cognitive disabilities.

[3] Two DNA tests were performed on the biological material on the victim's underpants, an "Identifiler" test and a "PowerPlex Y" test. The PowerPlex Y test identifies the Y chromosome, or male genetic markers, in the sample and is used where there is a potential mixture of male and female DNA. See *People* v. *Stevey*, 209 Cal. App. 4th 1400, 1413, 148 Cal. Rptr. 3d 1 (2012) ("Both the strength and the weakness of the Y–STR testing is the fact that only males have the Y chromosome. . . . As a result, the Y–STR testing can be used to resolve difficult mixed-source samples by examining the DNA of only the male." [Citation omitted.]); see also 2 P. Giannelli et al., Scientific Evidence (5th Ed. 2012) § 18.03 [d], p. 61. In the present case, the DNA profile generated using the Identifiler test included the victim as a possible source of the DNA, but excluded the defendant as a possible source. The male DNA profile generated using the Powerplex Y STR test included the defendant as a possible source of the DNA.

[4] The three counts of sexual assault were based on the allegations of cunnilingus, penile-vaginal intercourse, and penile-anal intercourse. The three counts of risk of injury to a child were based on contact with the intimate parts of a child under sixteen years of age.

[5] Section 6-10 of the Connecticut Code of Evidence provides:

"(a) Prior inconsistent statements generally. The credibility of a witness may be impeached by evidence of a prior inconsistent statement made by the witness.

"(b) Examining witness concerning prior inconsistent statement. In examining a witness concerning a prior inconsistent statement, whether written or not, made by the witness, the statement should be shown to or the contents of the statement disclosed to the witness at that time.

"(c) Extrinsic evidence of prior inconsistent statement of witness. If a prior inconsistent statement made by a witness is shown to or if the contents of the statement are disclosed to the witness at the time the witness testifies, and if the witness admits to making the statement, extrinsic evidence of the statement is inadmissible, except in the discretion of the court. If a prior inconsistent statement made by a witness is not shown to or if the contents of the statement are not disclosed to the witness at the time the witness testifies, extrinsic evidence of the statement is inadmissible, except in the discretion of the court."

[6] Defense counsel agreed that limited portions of the department report should be admitted: "The only point that I feel as though should come under

[*State* v. *Palozie*, supra, 165 Conn. 288] . . . is the statement regarding [Glofka's] reported [statement] that [K's] known to make up stories. And that's it in terms of [K's] statements . . . . I'm not really eager to make an argument on that stuff; I'm not really seeking to have that stuff [be] admissible . . . ."

[7] The defendant also claims that the production of the evidence was required under the compulsory process clause of the sixth amendment. In *Pennsylvania* v. *Ritchie*, supra, 480 U.S. 56, however, the United States Supreme Court declined to consider whether the compulsory process clause is implicated in cases involving privileged records, and instead adopted the due process framework set forth in *Brady* v. *Maryland*, supra, 373 U.S. 83.

[8] In *Pennsylvania* v. *Ritchie*, supra, 480 U.S. 43, the defendant was charged with sexually assaulting his thirteen year old daughter. Due to the nature of the incident, the assault was reported to the state children and youth services agency. Id. Prior to trial, the defendant argued that he was constitutionally entitled to review the contents of the agency's file because it might include evidence favorable to his defense. Id., 44. The Supreme Court rejected the defendant's claim that he should have been granted access to the file because it implicated his sixth amendment right of confrontation— terming that a trial right and not a pretrial right. Id., 52–53. The Supreme Court concluded, however, that the defendant was entitled to have the trial court review the file, in camera, under the fourteenth amendment due process clause. Id., 56, 58.

[9] The state analyzes the defendant's claim under the legal framework set forth by our Supreme Court in *State* v. *Esposito*, 192 Conn. 166, 179–80, 471 A.2d 949 (1984), a decision that predates the United States Supreme Court's decision in *Ritchie*. *Esposito* affords the defendant access to a witness' confidential records if the records contain information that implicates the defendant's sixth and fourteenth amendment right to confront and impeach the witness. See id., 178–79. Thus, under *Esposito*, the relevant consideration for the court in conducting an in camera review of a witness' confidential records is whether the records contain information that is probative of the witness' ability to tell the truth, or whether there is information that relates to the witness' capacity or ability to relate facts bearing on the issues at trial. Id., 176. When the court concludes that information in the records impacts the defendant's ability to impeach or discredit the witness, the remedy is to disclose the relevant portions of the records to the defense, or if the witness refuses to consent to such disclosure, the court may strike the witness' testimony. Id., 179–80. On the other hand, *Pennsylvania* v. *Ritchie*, supra, 480 U.S. 43, "creates a broader right for an in camera inspection of qualified privileged documents under the due process clause of the fourteenth amendment than exists pursuant to the sixth amendment right of confrontation"; *State* v. *Leduc*, 40 Conn. App. 233, 248, 670 A.2d 1309 (1996); and the court's review of the confidential records centers on *Brady*'s materiality standard–that is, whether the records contain impeachment evidence and/or evidence that bears on the defendant's culpability in the alleged crimes. See *State* v. *Falcon*, 90 Conn. App. 111, 121, 876 A.2d 547, cert. denied, 275 Conn. 926, 883 A.2d 1248 (2005). In this case, the confidential records were brought to the court's attention by the prosecutor pursuant to his constitutional and statutory obligation to disclose exculpatory information and materials. We, thus, consider the defendant's claim under the *Brady* framework.

[10] The state agrees that this court should review the records.