## STATE OF CONNECTICUT *v.* MARK REYNOLDS
## (AC 29653)

Bishop, Gruendel and Harper, Js.

Argued April 21—officially released December 8, 2009

*Mary Beattie Schairer*, special public defender, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Cynthia S. Serafini*, senior assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Mark Reynolds, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), coercion in violation of General Statutes § 53a-192 (a) (3) and unlawful restraint in the second degree in violation of General Statutes § 53a-96 (a), as a lesser included offense of unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a).[1] The defendant claims that (1) prosecutorial impropriety deprived him of a fair trial, (2) this court should exercise its supervisory powers and set aside his conviction because the prosecutor engaged in deliberate prosecutorial impropriety, (3) the court's jury instructions concerning sexual assault in the first degree misled the jury and (4) the evidence did not support the jury's guilty verdict as to the crime of coercion. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts.

[1] The court imposed a total effective sentence of twenty years incarceration, execution suspended after eleven years, followed by a twenty year term of probation. The jury rendered a not guilty verdict as to one count of kidnapping in the first degree and one count of unlawful restraint in the first degree.

In late February or early March, 2006, the victim was walking along a Waterbury street on a cold and windy morning. The defendant, who was operating an automobile on the street, drove near the victim and invited her to ride with him. The victim accepted his invitation. While the defendant drove the victim to her place of employment, he conversed with her about their shared interest in music. The defendant and the victim exchanged telephone numbers and, in the following days, amicably spoke to each other on the telephone.

About one week later, the victim accepted the defendant's invitation to accompany him to his apartment at 23 Eastwood Avenue in Waterbury. There, the defendant played a DVD related to the musical interests that he shared with the victim. During this encounter, the defendant kept trying to get close to the victim and encouraged her to spend more time with him. This flirtatious behavior caused the victim to feel uncomfortable, and, at her request, the defendant drove her home without incident.

Late the following day, March 13, 2006, the defendant called the victim on the telephone. During a conversation with the victim, the defendant informed her that he had photographs and a video of her and that these materials were of a sexual nature. The defendant said that he knew the victim was "a good girl" and that she would want to see these images of her. He said that he was trying to protect the victim, and that if he were a different type of person, he would not have told her about them.

At approximately 1 a.m. on March 14, 2006, the defendant picked up the victim at her home. The victim had asked the defendant to bring the images to her, but he did not do so, stating that she could see them at his apartment. The victim agreed to accompany the defendant to his apartment. Upon arriving at the defendant's

apartment, the defendant elaborated as to the nature of the images but did not show them to the victim. The defendant told the victim that the images depicted her in a sexual act with a former boyfriend and that, if he so desired, he could profit from his possession of these images of her. The victim did not know anything about the photographs or the video.

Once in the apartment, the victim asked the defendant about the images, but those inquiries irritated him. The defendant told the victim that she was being selfish. He commented on her sexual relationship with a prior boyfriend and asked her why she was not engaging in sexual activities with him. The victim replied that she was not interested in a sexual relationship with the defendant. In response, the defendant threatened to distribute the images of the victim that he claimed to possess but did not show those images to the victim. The victim told the defendant, "go ahead, do what you have to do because I'm not interested in you that way. I'm not having sex with you."

The victim began to walk toward the door and leave the apartment, at which time the defendant's manner became far less friendly. The defendant positioned himself between the victim and the door and, in an aggressive tone that frightened the victim, instructed her to sit down. He pushed her onto a nearby bed. The defendant told the victim that she was selfish and that if he wanted to be with her sexually he could just "take it" from her. The defendant admonished the victim not to make him "get rough" with her and told her to remove her clothing. The victim complied. Afterward, the defendant removed his clothing, positioned himself on top of the victim and forcibly engaged in penile-vaginal intercourse with the victim.

After the assault ended, the defendant led the victim to a bathroom and instructed her to take a shower.

After the victim showered, the defendant took a photograph of the victim. The victim dressed herself and asked the defendant to take her home. The defendant drove the victim home, during which time he asked the victim repeatedly to forgive him and not to report the incident to anyone.

After returning home, the victim spoke with a friend and told her that she had been raped. Later that day, the victim told her mother that she had been raped. The victim's mother notified the police, and the victim provided the police with a written statement. The victim also went to a local hospital, where a rape kit was administered. Additional facts will be set forth as necessary.

I

First, the defendant claims that prosecutorial impropriety during the state's examination of two witnesses deprived him of a fair trial. We disagree.

The following facts, as appear in the record, underlie the defendant's claim. On the first day of trial, outside of the presence of the jury, one of the defendant's attorneys raised an issue with the court concerning the contents of a written report that was prepared by a physician, Robert Kugler, who had examined the victim at the hospital. The defendant's attorney stated that, after obtaining the report from the state and having reviewed its contents, defense counsel was in the process of seeking an expert witness to testify with regard to the specific diagnosis that appeared in Kugler's report. Kugler had made a diagnosis of "sexual assault." The defendant's attorney also stated that he intended to object to the admissibility of the diagnosis. At that time, the court did not rule on the admissibility of that

portion of the report but stated that § 7-3 of the Connect-icut Code of Evidence[2] regarding expert testimony on the ultimate issue to be determined by the jury applied.

Later that day, outside of the presence of the jury, the court revisited the issue and ruled that the diagnosis of sexual assault was inadmissible. The court stated, "I don't see how an expert could testify on direct exami-nation, that is, a doctor, that this was rape." The prose-cutor replied that she did not intend to elicit such a diagnosis from Kugler but intended to ask him about his physical findings described in the report. With regard to the diagnosis of sexual assault, the prosecutor stated, "clearly that's not a medical diagnosis, I don't believe." When the defendant's attorney indicated that he was still attempting to find an expert witness to challenge the validity of the diagnosis of sexual assault, the court reiterated that the diagnosis was inadmissible.

The next day, the defendant's attorney indicated that, in light of the court's ruling and depending on the man-ner in which Kugler explained his findings during his testimony, the defense "may not need an expert [wit-ness]." Once again, the court referred to its ruling disal-lowing Kugler's diagnosis of sexual assault. In the presence of the jury, the state elicited testimony from Kugler during its case-in-chief. Kugler testified that he had examined the victim concerning her claim of sexual assault and that, as noted in his records, he had observed an abrasion and a small tear around the open-ing of her vagina. Kugler testified that his findings in this regard were unusual and were consistent with the victim's claim of penile penetration. The following col-loquy then occurred:

---

[2] Section 7-3 (a) of the Connecticut Code of Evidence provides in relevant part that "[t]estimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that . . . an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue."

"[The Prosecutor]: [B]ased on your examination, were you able to determine how that injury occurred?

"[Kugler]: No.

"[The Prosecutor]: And that's not something you would ever be able to determine, is it?

"[Kugler]: No.

"[The Prosecutor]: Now, after you examined [the victim], did you form a diagnosis?

"[Kugler]: My diagnosis—"

At that point in the proceeding, the defendant's attorney objected, and the court excused the jury. The court, reminding Kugler that the question called for an answer of "yes or no," asked him if he had formed a diagnosis. Kugler replied in the affirmative. Concerning her line of inquiry, the prosecutor represented to the court that she had intended to ask Kugler to explain the basis of his diagnosis. Kugler replied that his diagnosis was based on the information provided to him by the victim. The following colloquy then occurred outside of the presence of the jury:

"[The Prosecutor]: And your examination of her?

"[Kugler]: Not necessarily, no.

"[The Prosecutor]: Did that influence your diagnosis at all?

"[Kugler]: My diagnosis would still be sexual assault even in the absence of any physical findings based on what the patient told me.

"[The Prosecutor]: So . . . [y]ou don't know or do you know, based on your diagnosis, how that injury occurred?

"[Kugler]: No. With certainty, no.

"[The Prosecutor]: So, the diagnosis of sexual assault was based on the information that the [victim] gave to you during your examination?

"[Kugler]: Yes.

"[The Prosecutor]: That's where I'm going with that, Your Honor."

The defendant's attorney opposed the line of inquiry, noting that the court had ruled that the diagnosis of sexual assault was inadmissible. The court stated: "The diagnosis is an opinion. When [Kugler] says 'sexual assault,' that's an opinion on the ultimate issue. That's proscribed by § 7-3 of the [Connecticut] Code of Evidence. . . . I don't see how I can allow it under § 7-3." The prosecutor replied that Kugler's diagnosis was relevant because it helped to explain why he took certain actions with regard to the victim, such as administering a rape kit. The court reiterated its prior ruling that the evidence was inadmissible as an expert opinion concerning an ultimate issue to be determined by the jury. Thereafter, the defendant's attorney moved for a mistrial. In support of the motion, the defendant's attorney argued that the question posed to Kugler by the prosecutor was likely to raise an unanswered question in the minds of the jurors as to why Kugler's diagnosis was not in evidence. The court denied the motion. In the absence of an objection, the court ruled that medical reports concerning the victim's treatment following the incident could be admitted into evidence, provided that any reference to a diagnosis of sexual assault be redacted from the reports. After the court summoned the jury back to the courtroom, it stated that "in [an] attempt to shortcut some of this," two documents had been marked as full exhibits. The prosecutor, during her examination of Kugler, then referred to the two medical reports in evidence.

The next day, the defendant's attorney asked to be heard concerning the events of the prior day. He stated that he intended to elicit testimony from another physician for the purpose of explaining that a physician cannot objectively diagnose sexual abuse. Also, the defendant's attorney emphasized that the prosecutor's questioning of Kugler concerning a diagnosis, followed by defense counsel's objection to the question, unfairly had prejudiced the defendant in the eyes of the jury. The defendant's attorney argued that the court unambiguously had ruled that evidence of the diagnosis was inadmissible and that the prosecutor's question, although not answered by Kugler, unfairly left the jury with the impression that defense counsel did not want to disclose Kugler's diagnosis because it was prejudicial to the defendant's case. He also stated that if the prosecutor had complied with the court's ruling as to the inadmissibility of the evidence, the defendant would not have been so prejudiced. The prosecutor argued that the defendant's argument was unpersuasive because she merely had asked Kugler if he had formed a diagnosis, not the substance of such diagnosis.

In response to the arguments of counsel, the court inquired of the defendant's attorney whether he was requesting that the court remind the jury that the questions posed to witnesses by the attorneys were not evidence. The defendant's attorney replied that he was not making such a request. Although the court already had denied the defendant's motion for a mistrial, it nevertheless expressed its dissatisfaction with the prosecutor's examination of Kugler. The court observed that nonattorney witnesses, such as Kugler, typically fail to recognize the difference between a "yes or no question" and a question asking for an explanation. The court noted that the question posed to Kugler, asking him if he had reached a diagnosis, was risky insofar as it might

have prompted Kugler, in the presence of the jury, to reveal the substance of his diagnosis.

Later, the court permitted the defendant to present testimony from Peter Jacoby, a medical doctor employed as the chairman of the emergency department at the hospital where the victim had received medical treatment. Jacoby testified concerning the difference, in medical terminology, between objective findings, which are based on the observations of a medical provider, and subjective findings, which are based on the information provided to a medical provider by a patient. Jacoby noted that the victim had complained to emergency room personnel that she had been sexually abused. Having reviewed the redacted emergency room report in evidence, however, Jacoby testified that, with reasonable medical certainty and based solely on the objective findings in the medical reports in evidence, he could not make any diagnosis concerning the victim.

The medical records in evidence indicated that, during the victim's examination at the hospital, Kugler observed an abrasion near her vagina. During the state's cross-examination of Jacoby, the prosecutor asked him: "[B]ased on your experience as [an emergency room] physician . . . if a complainant came in or a person came into the emergency room complaining of alleged sexual assault and after you had examined her, you found an abrasion inside of her vagina, what would your diagnosis be?" The court sustained the defendant's objection to that question. Jacoby testified that, generally, he would formulate a diagnosis based on what the patient reported to him as well as his objective findings, not his objective findings alone. At the conclusion of Jacoby's testimony, the court instructed the jury that the issue of whether a sexual assault had occurred in this case was an issue for the jury, and not for any expert witness, to resolve.[3]

[3] In this regard, the court made the following statements to the jury: "[T]he state of the law is that we could have the entire American Medical

After the jury returned its verdict, the defendant moved for a new trial. One of the grounds for the motion concerned the prosecutor's questioning of Kugler following the court's ruling that Kugler's diagnosis of sexual assault was inadmissible. The defendant claimed that the court had improperly denied his motion for a mistrial. Consistent with his earlier argument, the defendant's attorney argued that because he had objected to the state's examination of Kugler, the defendant was unfairly prejudiced in the eyes of the jury. He argued that the jury was left with the impression that Kugler's diagnosis was unfavorable to his case. Furthermore, defense counsel argued that the prosecutor's inquiry of Kugler, concerning evidence that the court had ruled to be inadmissible, rose to the level of prosecutorial impropriety and deprived him of a fair trial.

In a thorough memorandum of decision, the court denied the defendant's motion for a new trial. As a preliminary matter, the court concluded that prosecutorial impropriety had not occurred. The court stated: "From a literal standpoint, the prosecutor did not violate the court's order that no expert evidence could be adduced as to whether or not the defendant had sexually assaulted the victim. Her question to [Kugler] did not elicit what his expert opinion was as to whether the victim had been sexually assaulted." Nonetheless, the court observed that the prosecutor had admitted that she had intended to ask Kugler about his diagnosis

---

Association in here with opinions and diagnoses. Whether there was a sexual assault in the first degree—and I'll be explaining what that is under the law—whether there was, is entirely up to the jury, not to any experts. It's a lay question for the jury."

The following day of trial, the court asked the defendant's attorney: "Was I strong enough . . . with my remarks to the jury that this is not a question for a doctor, as far as the sexual assault is concerned, that this is a question of fact for the jury?" The defendant's attorney replied in the affirmative and did not ask the court to deliver any additional instructions to the jury with regard to this issue.

of sexual assault and that her question was "prelimi-
nary" to that forbidden line of inquiry. The court stated
that it was "at a loss" to explain the prosecutor's
conduct.

Next, the court referred to the following factors in
concluding that the prosecutor's question had not
deprived the defendant of a fair trial. First, the prosecu-
tor had not violated the court's order. Second, despite
the fact that the prosecutor's question might have elic-
ited inadmissible testimony, Kugler had not answered
the prosecutor's question. Third, after the defendant's
objection to the question, and immediately after the
jury had returned to the courtroom, the court had drawn
the jury's attention to its admission of two exhibits,
which were redacted medical records of the victim. The
court had suggested to the jury that whatever Kugler
had to say about the victim was contained in those
records. Fourth, the court had instructed the jury that
the questions asked by counsel and the objections of
counsel were not evidence. Fifth, and finally, the court
had permitted the defendant to present Jacoby's testi-
mony to the jury as a means of explaining Kugler's tes-
timony.

On appeal, the defendant argues that the prosecutor
committed prosecutorial impropriety in her questioning
of both Kugler and Jacoby, as set forth previously. In
those instances, the defendant argues, "the prosecutor
asked, in violation of a court order, prohibited questions
of two medical doctors regarding diagnosis, the ulti-
mate issue on the first count" of the information, which
alleged sexual assault in the first degree. The defendant
argues: "[D]espite the court's repeated ruling that no
medical testimony on diagnosis could come into evi-
dence, the prosecutor was determined to circumvent
this order. . . . It is irrelevant that the doctors did not
answer the prohibited questions; even an attempt to
get inadmissible evidence into a trial, or to otherwise

intend to undermine the rulings of a trial court, violates due process." Discussing the questions posed to both physicians concerning the proper diagnosis of the victim, the defendant asserts that the prosecutor deliberately attempted to violate the court's evidentiary ruling. The defendant states: "The prosecutor's actions were a clear and calculated attempt to directly circumvent the [court's evidentiary] order and the rules of evidence in order to win her case at all costs." The defendant argues that the fact that his counsel objected to the state's questioning of both physicians, as described previously, caused the jury to believe that he had prevented the jury from hearing evidence unfavorable to his case and, thus, unfairly prejudiced him in the eyes of the jury.[4]

Our Supreme Court previously has recognized that "a claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis under *State* v. *Williams*, 204 Conn. 523, 535–40, 529 A.2d 653 (1987). . . . In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial. . . . To determine whether the defendant was deprived of his due process right to a fair trial, we must determine

[4] We note that, at trial, the defendant merely had objected on evidentiary grounds to the prosecutor's questioning of Jacoby at trial; he did not argue before the court that the prosecutor had engaged in prosecutorial impropriety or that, on this basis, he had received an unfair trial. Nonetheless, we will consider the defendant's claim as it relates to the prosecutor's examination of both Kugler and Jacoby because, in accordance with *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004), prosecutorial impropriety claims that are not objected to at trial are reviewable on appeal in accordance with the analysis set forth in *State* v. *Williams*, 204 Conn. 523, 535–40, 529 A.2d 653 (1987), provided that impropriety, in fact, occurred.

whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . .

"The . . . determination of whether the defendant was deprived of his right to a fair trial . . . involve[s] the application of the factors set forth by [our Supreme Court] in *State* v. *Williams*, [supra, 204 Conn. 540]. As [the court] stated in that case: In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Gould*, 290 Conn. 70, 77–78, 961 A.2d 975 (2009).

"It is well settled that prosecutorial disobedience of a trial court order, even one that the prosecutor considers legally incorrect, constitutes improper conduct." *State* v. *Ortiz*, 280 Conn. 686, 704, 911 A.2d 1055 (2006). "[A] state's attorney should scrupulously avoid questions of probable impropriety . . . . A demonstrated deliberate effort by a prosecutor to influence the jury against the defendant through the attempted introduction of obviously inadmissible evidence may entitle the defendant to a new trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Butler*, 55 Conn. App. 502,

508, 739 A.2d 732 (1999), aff'd, 255 Conn. 828, 769 A.2d 697 (2001).

We begin our analysis by observing that the issue of the admissibility of Kugler's diagnosis was addressed by the parties and resolved by the court prior to Kugler's testimony. In the presence of the prosecutor and the defendant's counsel, the court disallowed Kugler's diagnosis of sexual assault and set forth the legal basis of its ruling. Although the court's ruling technically precluded only Kugler's diagnosis, it is reasonable to interpret the court's ruling as precluding *any* diagnosis of sexual assault. The prosecutor, an officer of the court, had a duty to uphold the letter and spirit of the court's order.

Acknowledging the court's unambiguous ruling, the prosecutor stated that Kugler's diagnosis of sexual assault was "clearly . . . not a medical diagnosis" and assured the court that she intended to ask Kugler about his observations during his examination of the victim. The court correctly observed that the prosecutor did not violate the letter of its order when she asked Kugler if he had formed a diagnosis. Nevertheless, the court observed that the question asked of Kugler, by its nature, was likely to elicit an answer that revealed his diagnosis. The court observed, as well, that the prosecutor had represented that she had intended to ask Kugler questions about how he reached *his diagnosis of sexual assault*. The prosecutor's representations afford us a unique opportunity to consider her mindset; they reveal that she did, in fact, intend to elicit the evidence that the court expressly had disallowed. Insofar as she, acting with this mindset, took a first step in a forbidden line of inquiry concerning Kugler's diagnosis, she engaged in prosecutorial impropriety.

Additionally, the prosecutor invited Jacoby to state a diagnosis of the victim's condition that was based on

Kugler's observations of the victim as well as the victim's representation that she had been the victim of sexual assault. After reviewing the examination, we view the prosecutor's inquiry as an attempt to elicit from Jacoby a diagnosis of sexual assault. Following, as it did, the court's evidentiary ruling as well as the prosecutor's failed attempt to elicit diagnosis evidence from Kugler, the prosecutor had ample notice that this inquiry plainly was prohibited by the court. The prosecutor's attempt to elicit such testimony was improper.

Having identified prosecutorial impropriety during the prosecutor's examination of Kugler and Jacoby, we next consider whether it deprived the defendant of a fair trial. Here, it does not appear that defense counsel's conduct or argument invited the prosecutor's conduct. In both instances, the state attempted to elicit a diagnosis that was precluded by the court's order. Defense counsel specifically argued that Kugler's diagnosis was inadmissible. The court thereafter permitted defense counsel to examine Jacoby with regard to the issue of diagnosis and, specifically, the inability of any physician to form a diagnosis of sexual assault on the basis of objective findings alone, *in response to the prosecutor's improper questioning of Kugler*. Defense counsel's questioning of Jacoby was not improper and did not invite an expert opinion as to a diagnosis that was based on the victim's subjective complaints. Accordingly, we conclude that defense counsel did not invite either instance of impropriety.

Next, we consider the severity and frequency of the impropriety. Here, the impropriety occurred only two times during the presentation of evidence; it did not affect every phase of the proceeding. When the defendant's objections to the inquiries were sustained by the court, the prosecutor thereafter abandoned the challenged inquiries. The fact that the prosecutor did not

actually reveal inadmissible evidence or elicit inadmissible testimony in the jury's presence is significant to our analysis. In each instance, the prosecutor inquired about a diagnosis, but the witnesses did not reveal a diagnosis. Further, unlike the defendant, we are not persuaded that in the context of the entire trial the questions were of such a prejudicial nature that they were likely to have left any lasting impression in the minds of the jurors.

The subject of the impropriety, the medical diagnosis of sexual assault, was central to the critical issue in the case of whether the victim, in fact, had been sexually assaulted. As the defendant argues, a diagnosis from a medical doctor that the victim had been sexually assaulted clearly would have been prejudicial to his defense. The actual impropriety, however, concerned two questions about diagnosis that were not answered by the physicians on the witness stand. Furthermore, the court promptly addressed the defendant's objections to the prosecutor's conduct. Following Kugler's examination, the court expressed its willingness to deliver a curative instruction to the jury; the defendant's counsel stated that no such instruction was necessary. The court thereafter permitted the defendant to present Jacoby's testimony to address the issue of whether Kugler could reasonably have formed a medical diagnosis in this case. Following Jacoby's testimony, the court unambiguously instructed the jury that the issue of whether the victim had been sexually assaulted was an issue for it, and not any witness, to decide. The court, during its charge, delivered instructions of a similar nature to the jury.

Finally, as is typical in cases in which the dispositive issue is whether sexual conduct was consensual or assaultive in nature, we observe that the state's case rested heavily on the victim's credibility. The defendant

testified that he and the victim had engaged in consensual sexual intercourse; the victim testified that she had been sexually assaulted. Although Kugler made physical findings concerning the victim that tended to corroborate her claim of sexual assault, those findings were not dispositive.

Our review of the *Williams* factors leads us to conclude that the prosecutor did not so infect the trial with unfairness as to make the defendant's conviction a denial of due process. Although the state's case was not particularly strong and the uninvited impropriety potentially concerned a critical issue in the case, the impropriety was neither frequent nor severe. Additionally, the court appropriately took curative measures that adequately lessened the likelihood that the impropriety caused the defendant any prejudice in the minds of the jurors. Accordingly, we conclude that the impropriety was not harmful and reject the defendant's due process claim.

## II

Next, the defendant claims that, even if his right to due process was not violated, this court should exercise its supervisory powers, reverse his conviction and remand the case for a new trial because the prosecutor deliberately violated the court's order. We disagree.

"[I]n considering claims of prosecutorial misconduct, we apply a due process analysis and consider whether the defendant was deprived of a fair trial. . . . A different standard is applied, however, when the claim involves deliberate prosecutorial misconduct during trial which violates express court rulings . . . . When such an allegation has been made, we must determine whether the challenged argument was unduly offensive to the maintenance of a sound judicial process. . . . If we answer that question in the affirmative, we may

invoke our supervisory powers to reverse the defendant's conviction. . . . In determining whether the use of our supervisory powers to reverse a conviction is appropriate, we consider whether the effect of the challenged remark was to undermine the authority of the trial court's ruling . . . . We also consider the degree of prejudice suffered by the defendant as a result of the remark. . . .

"Our Supreme Court . . . has urged a cautionary approach in this regard, noting that [r]eversal of a conviction under our supervisory powers . . . should not be undertaken without balancing all of the interests involved: the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct. . . .

"In *State* v. *Ubaldi*, 190 Conn. 559, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983), our Supreme Court first enunciated the principles relevant to claims of deliberate prosecutorial impropriety in violation of a trial court's ruling. Our Supreme Court held that, where such impropriety has occurred, an appellate court may exercise its inherent supervisory authority over the administration of justice to defend the integrity of the judicial system. . . . The court blatantly rejected the argument that it could upset a criminal conviction on account of prosecutorial impropriety only where such conduct had deprived the defendant of his constitutional right to a fair trial. . . . Instead, the court recognized that, given the proper circumstances and regardless of whether deliberate impropriety deprived a defendant of a fair trial, the drastic step of upsetting a criminal conviction might be necessary to deter conduct undermining the integrity of the judicial system. . . . Thus, after weighing relevant

considerations, the court placed a primacy upon its responsibility for the enforcement of court rules in prosecutorial [impropriety] cases and for preventing assaults on the integrity of the tribunal. . . . The court reasoned that it had an obligation to deter purposeful impropriety and concluded that reversal in cases involving such deliberate conduct may be warranted even where a new trial is not constitutionally mandated. . . . Hence, the touchstone of our analysis in a claim of this nature is not the fairness of the trial but the existence of misconduct that deliberately circumvents trial court rulings." (Citations omitted; internal quotation marks omitted.) *State* v. *David O.*, 104 Conn. App. 722, 729–30, 937 A.2d 56 (2007), cert. denied, 285 Conn. 915, 943 A.2d 473 (2008).

We begin our analysis recalling that the court did not find that the prosecutor deliberately had engaged in impropriety or that she deliberately had undermined its ruling. To the contrary, the court, discussing the prosecutor's questioning of Kugler, found that the prosecutor had not violated its ruling. Additionally, when the defendant objected to the prosecutor's inquiry of Jacoby, the court merely sustained the defendant's objection and did not thereafter comment on the propriety of the prosecutor's questioning of Jacoby. "[W]e look with interest on the court's primary determination as to whether the prosecutor's [conduct] was a flagrant or deliberate violation of [the court's] ruling, one that was unduly offensive to the maintenance of a sound judicial process, or whether the prosecutor made a minor transgression, of little or no significance at trial." (Internal quotation marks omitted.) Id., 731.

We already have concluded that the prosecutor's conduct was improper insofar as she intended and attempted to elicit testimony from Kugler concerning his diagnosis of sexual assault and, in her questioning of Jacoby, posed a question that was likely to reveal

a diagnosis of sexual assault. The prosecutor clearly violated the spirit of the court's unambiguous evidentiary ruling, and there is no basis on which to conclude that the prosecutor's conduct was not purposeful.

We recognize, however, that not every instance of prosecutorial impropriety warrants a new trial or the exercise of our supervisory powers to deter purposeful misconduct. Here, the questions posed before the jury did not refer to inadmissible testimony or directly call for any witness to reveal testimony of such nature. During this questioning, the prosecutor technically abided by the court's ruling. Although it is not dispositive in our analysis, we also are mindful that the consequence of the impropriety was not severe and it did not deprive the defendant of a fair trial. Also, the misconduct, in the context of the entire trial, was isolated. For all of these reasons, we do not conclude that the conduct at issue was unduly offensive to the maintenance of a sound judicial process or that the prosecutor flagrantly or deliberately violated the court's ruling. Furthermore, we also recognize the emotional trauma that the victim likely would suffer during a new trial; she would be called on a second time to revisit the circumstances of her sexual assault. For all of these reasons, we decline to exercise our supervisory powers in this case.

### III

Next, the defendant claims that the court's jury instructions concerning sexual assault in the first degree misled the jury. We reject the defendant's claim.

Before reaching the merits of the claim, we first address the state's contention that we should decline to review the claim because, with regard to the instructional language at issue, the defendant waived any objection to the charge. The record reveals the following relevant facts. Prior to the evidentiary phase of

the trial, the defendant submitted a written request to charge. Within his requested instruction for the crime of sexual assault in the first degree, the defendant requested that the court instruct the jury that the state bore the burden of proving beyond a reasonable doubt that the defendant engaged in sexual intercourse with the victim and that he compelled the victim to engage in intercourse. The requested instruction also included the following language: "The actual consent of the victim to sexual intercourse will negate the element of compulsion by threat of force. The consent required, however, must be actual and real, and not just mere surface acquiescence induced by fear or shock. In order for consent to sexual intercourse to negate the element of compulsion, the intercourse must be engaged in by the other person with no compulsion, no threat, no fear. In other words, it must be a truly voluntary and willing act of sexual intercourse. Consent may be express or it may be implied from all the circumstances then and there existing. Whether or not [the victim] consented to the sexual intercourse is a question of fact which you must determine from all the circumstances which have been proven to you."

Several days prior to delivering its charge, the court noted for the record that it had provided draft copies of its jury charge to the parties and had marked a draft copy of its charge as a court exhibit. With regard to the consent portion of the sexual assault instruction, the draft charge provided to counsel was materially identical to the charge that the court later delivered to the jury. As relevant, the draft charge included instructions that the state bore the burden of proving beyond a reasonable doubt that the defendant, either by the use of force or the threat of the use of force, compelled the victim to engage in sexual intercourse with him. The draft charge then included the following instruction: "But if you find that the [victim] . . . consented

to the act of sexual intercourse, you cannot find that the act was compelled. Such consent must have been actual and not simply acquiescence brought about by force, by fear, or by shock. The act must have been truly voluntary on the [victim's] part. Consent may be express or you may find that it is implied from the circumstances that you find existed. Whether there was consent is a question of fact for you to determine." Thereafter, the draft charge provided that the state bore the burden of proof with regard to both elements of the crime.

After distributing its draft charge, the court discussed with counsel several issues concerning the charge but not the instruction concerning consent. After discussing some changes to the charge, unrelated to the instruction at issue, the court invited counsel to raise any additional objections to the draft charge. The defendant's attorney stated: "That's all, Your Honor." During the next day of trial, the court and counsel conferred on the record concerning additional matters in the court's draft charge, all of which were unrelated to the court's consent instruction. After discussing these other instructions, the court asked the parties if there were any other requested changes to the draft charge. The defendant's attorney stated: "No, Your Honor."

During the court's charge, the court instructed the jury that the state bore the burden of proving beyond a reasonable doubt each element of each of the charged crimes. With regard to the sexual assault instruction, the court instructed the jury that the state bore the burden of proving beyond a reasonable doubt that the defendant compelled the victim to engage in sexual intercourse. After instructing the jury that the alleged conduct of the defendant, his use of force or his threatened use of force, was the relevant consideration in determining his guilt, the court stated: "But if you find that the [victim] . . . consented to the act of sexual

intercourse, you cannot find the act was compelled, and you will find the defendant not guilty. Such consent must have been actual and not simply acquiescence brought about by force, by fear or by shock. The act must have been truly voluntary on [the victim's] part. Consent may be expressed or you may find it is implied from the circumstances that you find existed. Whether there was consent is a question of fact for you to determine." After the court delivered its charge, it asked the parties if they had any exceptions to the charge. The defendant's attorney stated: "No, Your Honor."

For the first time on appeal, the defendant claims that the court's instruction concerning consent likely misled the jury and affected the outcome of trial. The defendant argues that the instruction tended to convey to the jury that he bore the burden of proving that the victim had consented to sexual intercourse. The defendant also argues that the court's charge did not adequately convey to the jury how the issue of consent was relevant to its consideration of the essential element of compulsion. The defendant, arguing that the instruction concerned the state's burden of proof as to an essential element of a crime, characterizes the claim as being constitutional in nature. The defendant argues that he preserved this issue for our review by virtue of his written request to charge and, in the alternative, argues that the claim is reviewable under the doctrine enunciated in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or that the instruction constitutes plain error. See Practice Book § 60-5. The defendant asserts that his written request to charge with respect to consent adequately conveyed to the jury the relevant legal principle at issue. Specifically, the defendant highlights his requested instruction, which provided: "The actual consent of the victim to sexual intercourse will negate the element of compulsion by threat of force."

Practice Book § 42-16 provides in relevant part: "An appellate court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of exception. . . ." See also *State* v. *Ramos*, 261 Conn. 156, 170, 801 A.2d 788 (2002) ("a party may preserve for appeal a claim that an instruction, which was proper to give, was nonetheless defective either by: [1] submitting a written request to charge covering the matter; or [2] taking an exception to the charge as given"). "The purpose of the rule is to alert the court to any claims of error while there is still an opportunity for correction in order to avoid the economic waste and increased court congestion caused by unnecessary retrials." *State* v. *Packard*, 184 Conn. 258, 281, 439 A.2d 983 (1981); see also *Henderson* v. *Kibbe*, 431 U.S. 145, 154, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977) ("[o]rderly procedure requires that the respective adversaries' views as to how the jury should be instructed be presented to the trial judge in time to enable him to deliver an accurate charge and to minimize the risk of committing reversible error"). It is a well settled principle in our appellate jurisprudence that, absent exceptional circumstances, it is unfair both to the trial court and the state for a defendant to pursue a claim of error on appeal that was not raised before the trial court or that conflicts with the theory of defense or defense strategy pursued at trial. See, e.g., *State* v. *Johnson*, 289 Conn. 437, 461, 958 A.2d 713 (2008); *State* v. *Randolph*, 284 Conn. 328, 374, 933 A.2d 1158 (2007); see also *State* v. *Dalzell*, 282 Conn. 709, 720, 924 A.2d 809 (2007) (characterizing appellate review of claims not raised at trial as trial by ambuscade).

In the present case, the defendant filed a written request to charge covering the instructional language

at issue in this claim. This filing, viewed in isolation, adequately preserved for appellate review the defendant's claim of instructional error. The issue raised by the state, however, is whether the defendant subsequently waived any objection to the court's charge by means of the aforementioned representations of his counsel, concerning the charge, which were made during the course of the trial. The state relies on the fact that the defendant's counsel twice represented to the court that he had no objection to the draft charge distributed by the court and, after the charge was delivered to the jury, that defense counsel did not object to the charge. The state contends that the defendant waived any objection to the instructional language at issue in this claim. A defendant is not entitled to review of a claim to which he waived any objection at trial.[5]

Recently, in *State* v. *Ebron*, 292 Conn. 656, 679–82, 975 A.2d 17 (2009), our Supreme Court clarified the principles governing the reviewability of claims of instructional error in cases in which a party has acquiesced to the charge given at trial.[6] In *Ebron*, our Supreme Court, relying in part on its earlier decision

---

[5] A defendant who waives a claim of constitutional dimension at trial cannot prevail under *Golding*'s third prong because the constitutional violation did not clearly exist and did not clearly deprive the defendant of a fair trial. See *State* v. *Holness*, 289 Conn. 535, 542, 958 A.2d 754 (2008); *State* v. *Fabricatore*, 281 Conn. 469, 481, 915 A.2d 872 (2007). Similarly, a valid waiver thwarts a plain error analysis. "[The] [p]lain [e]rror [r]ule may only be invoked in instances of forfeited-but-reversible error . . . and cannot be used for the purpose of revoking an otherwise valid waiver. This is so because if there has been a valid waiver, there is no error for us to correct. . . . The distinction between a forfeiture of a right (to which the [p]lain [e]rror [r]ule may be applied) and a waiver of that right (to which the [p]lain [e]rror [r]ule cannot be applied) is that [w]hereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." (Internal quotation marks omitted.) *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 70–71, 967 A.2d 41 (2009).

[6] As is true for the present claim, the claim of instructional error in *Ebron* was of constitutional magnitude.

in *State* v. *Madigosky*, 291 Conn. 28, 35 n.7, 966 A.2d 730 (2009), stated that an appellant will not be deemed to have waived a claim of instructional error unless it is shown that he "actively induced the trial court to give the . . . instruction that he . . . challenges on appeal." *State* v. *Ebron*, supra, 682. Thus, the court in *Ebron* held that the defendant, having acquiesced at trial to the jury instruction challenged on appeal, nonetheless was entitled to *Golding* review of his claim of instructional error because "he did not supply, or otherwise advocate for, the . . . language at issue in [the] appeal." Id., 681–82. Under *Ebron*, a party will have waived an objection to an instruction only if it has "actively induce[d] the trial court to act on the challenged portion of the instruction." Id., 680.[7]

---

[7] By narrowly defining waiver, in the context of claims of instructional error, as nothing less than a party's active inducement to give the specific instruction challenged on appeal, our Supreme Court in *Ebron* explicitly departed from decisions of this court that have held that waiver encompasses acquiescence by a defendant in the court's charge. *State* v. *Ebron*, supra, 292 Conn. 682 n.22. In one of those decisions, this court stated: "A defendant in a criminal prosecution may waive one or more of his or her fundamental rights. . . . Waiver is an intentional relinquishment or abandonment of a known right or privilege. . . . It involves the idea of assent, and assent is an act of understanding. . . . The rule is applicable that no one shall be permitted to deny that he intended the natural consequences of his acts and conduct. . . . In order to waive a claim of law it is not necessary . . . that a party be certain of the correctness of the claim and its legal efficacy. It is enough if he knows the existence of the claim and of its reasonably possible efficacy. . . . Connecticut courts have consistently held that when a party fails to raise in the trial court the constitutional claim presented on appeal and affirmatively acquiesces to the trial court's order, that party waives any such claim. . . .

"Moreover, the reason that the objection must be raised at trial is to afford the court an opportunity to correct an allegedly improper instruction. . . . When we speak of correcting the claimed error, we mean when it is possible during that trial, not by ordering a new trial. We do not look with favor on parties requesting, or agreeing to, an instruction or a procedure to be followed, and later claiming that that act was improper." (Citations omitted; internal quotation marks omitted.) *State* v. *Velez*, 113 Conn. App. 347, 357–58, 966 A.2d 743, cert. denied, 291 Conn. 917, 970 A.2d 729 (2009).

In the case at hand, the court conferred on the record with counsel for both parties concerning the jury charge. The defendant does not suggest

Applying the rationale and holding of *Ebron* to the facts of the present case, we disagree with the state that the defendant waived any objection to the instructional language at issue. Despite the fact that the defendant, during charge discussions, clearly communicated to the

that the court inadequately inquired of him regarding its intended charge or that the court misunderstood the representations of his counsel concerning the composition of the charge. Indeed, it is clear from the record that the court relied on defense counsel's agreement with its intended charge.

Our rules of practice provide: "After the close of evidence but before arguments to the jury, the judicial authority shall, if requested, inform counsel out of the presence of the jury of the substance of its proposed instructions. The charge conference shall be on the record or summarized on the record." Practice Book § 42-19. Thus, the charge conference is to afford counsel with a full and fair opportunity to review the court's instructions as well as to state objections to such instructions while there is still an opportunity to correct any errors or omissions. Simply put, this procedure affords an opportunity for dialogue between counsel and the court in advance of the charge. This process should help to avoid retrials arising out of instructional errors and prevent counsel from raising claims for the first time on appeal that either were not raised before the trial court or that conflict with such party's representations and agreements at trial.

Under *Ebron*, a party may now be permitted to acquiesce in a court's charge as a whole during a charge conference and, following an adverse verdict, obtain appellate review of a claim that one or more of the instructions contained therein were improper. The application of *Ebron*'s holding to the facts of this case makes this point. Here, a fair review of the record reveals that in charging discussions, defense counsel left the impression with the court that its charge adequately presented the issues and law to the jury. At times relevant, the court inquired of counsel whether any additional issues related to its charge existed, and the court reasonably relied on the affirmative representations of defense counsel that no such issues existed. Mindful of the purpose of a charge conference, we are concerned that *Ebron* could have the effect of rendering the charge conference an inconclusive and less meaningful exercise during which there may be a decreased incentive for counsel to clearly articulate a proposed charge in a difficult area when counsel may determine it is more advantageous to leave the door ajar for another day. Such a tactic could place an arduous, unnecessary burden on the trial court in its effort to compose a fair, accurate and legally appropriate jury charge and could result in unnecessary relitigation of criminal matters. Although we follow *Ebron, as we must*, and afford review to the defendant's claim under the particular circumstances we face, we express our concerns regarding the practical implications of its holding for the trial bench with the hope that, perhaps, this issue of waiver by acquiescence or concurrence has not seen its last day.

court that he had no objection to the court's draft charge and, later, clearly represented that he did not object to the charge delivered to the jury, we do not conclude that this acquiescence by defense counsel in the charge induced the court to utilize the instructional language at issue in this claim. Following *Ebron*, our Supreme Court has determined that a party will be deemed to have actively induced the court to give an instruction challenged on appeal if, after the court has discussed the propriety of such specific instruction with the parties or otherwise has drawn such specific instruction to their attention, he has assented to that instruction. See, e.g., *State* v. *Hampton*, 293 Conn. 435, 444–50, 978 A.2d 1089 (2009); *State* v. *Foster*, 293 Conn. 327, 335–39, 977 A.2d 199 (2009). In the present case, there is no evidence of assent that is specific to the instruction challenged on appeal. Accordingly, we will treat the defendant's claim as being preserved properly by virtue of his written request to charge.

"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and

ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Wallace*, 290 Conn. 261, 272–73, 962 A.2d 781 (2009).

As stated previously, the defendant argues that the court's instruction likely misled the jury into believing that he bore the burden of proving that the victim consented to the sexual encounter at issue and that the court failed adequately to explain how the issue of consent related to the essential element of compulsion.

Our review of the jury charge as a whole reflects that the court clearly and repeatedly instructed the jury that the state bore the burden of proving beyond a reasonable doubt the essential elements of the crimes with which he stood charged. With regard to this crime, the court unambiguously stated several times that the state bore the burden of proving beyond a reasonable doubt that the defendant compelled the victim to engage in sexual intercourse. Nothing in the charge, including the court's consent instruction, reasonably could be interpreted to suggest that the defendant bore the burden of demonstrating that the victim had consented to the sexual encounter at issue. Rather, in discussing the issue of consent, the court stated: "[I]f you find that the [victim] . . . consented to the act of sexual intercourse, you cannot find [that] the act was compelled, and you will find the defendant not guilty." Contrary to the defendant's arguments on appeal, this instruction adequately and directly conveyed how the issue of consent was related to the issue of compulsion; the court plainly instructed the jury that a finding of consent must result in a not guilty verdict as to the crime of sexual assault in the first degree.[8] For these reasons, we reject the defendant's claim.

---

[8] We conclude that the court's instruction was not likely to have misled the jury as to the state's burden of proof and the legal effect of a finding that the victim had consented to the sexual encounter with the defendant. Having reviewed the language in the defendant's request to charge with regard to the issue of consent, we also disagree with the defendant that his

## IV

Finally, the defendant claims that the evidence was not sufficient to support the jury's finding that he had committed the crime of coercion. We disagree.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

requested language was superior to that used by the court in its charge. The defendant's requested instruction did not clearly state that the defendant did not bear the burden of demonstrating that the victim had consented to the sexual encounter, but merely stated in relevant part that "[t]he actual consent of the victim to sexual intercourse will negate the element of compulsion by threat of force." Additionally, we conclude that the language utilized by the court to convey to the jury the legal effect of a finding that the victim had consented to the sexual encounter was easier to understand than the quoted language from the defendant's request to charge.

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Michael H.*, 291 Conn. 754, 759, 970 A.2d 113 (2009).

The state charged the defendant with violating § 53a-192 (a) (3), which provides in relevant part: "A person is guilty of coercion when he compels or induces another person to engage in conduct which such other person has a legal right to abstain from engaging in, or to abstain from engaging in conduct in which such other person has a legal right to engage, by means of instilling in such other person a fear that, if the demand is not complied with, the actor or another will . . . expose any secret tending to subject any person to hatred, contempt or ridicule, or to impair any person's credit or business repute . . . ."

In analyzing the sufficiency of the evidence, we must first consider the evidentiary burden that the court actually imposed on the state to prove that the defendant committed this crime. See, e.g., 5 C.J.S. 302, Appeal and Error § 951 (2007) ("in determining whether there is sufficient evidence to support the trial court's findings of fact, the appellate court bears in mind the quantum of proof which the party burdened at trial was required to produce in order to prevail"). It is undisputed that the state attempted to prove that the defendant instilled a fear in the victim that he would expose the photographs and video of her that he had claimed to have possessed. The court, however, in marshaling the evidence related to this count, limited the manner in which the state could prove that the defendant committed the crime. As relevant, the court instructed the jury that it was the state's burden to prove beyond a reasonable

doubt that the defendant induced the victim to do something that she had a legal right to abstain from doing and instructed the jury to consider her decision to go to the defendant's apartment during the early morning of March 14, 2006. The court instructed the jury that the state bore the burden of proving beyond a reasonable doubt that the defendant had demanded that the victim go to his apartment and had induced her to do so by instilling in her a fear that he would expose a secret about her that would expose her to ridicule.[9]

The defendant does not dispute that the victim accompanied him to his apartment on March 14, 2006. In his testimony, he denied that he ever told the victim that he possessed any images of her. On appeal, the defendant claims that the evidence did not support a finding that he caused the victim to fear that, if she did not go to his apartment, he would expose any images of her. The defendant argues that there was no evidence

---

[9] In its information, the state alleged that "the [defendant] compelled and induced the [victim] to engage in conduct which she had a legal right to abstain from engaging in . . . ." The court, in its charge on coercion, stated in relevant part: "For you to find the defendant guilty of this crime, coercion, the state must have proved beyond a reasonable doubt the following three elements: One, that the defendant made a demand on the [victim] . . . to do something; two, that the defendant induced [the victim] to do that thing which she had a legal right to abstain from doing; and three, that the defendant induced the [victim] by instilling in [her] a fear if his demand was not complied with, then the defendant would expose a secret tending to subject the [victim] to hatred, contempt or ridicule.

"The first element the state must have proven is the defendant made a demand on the [victim]. . . . *The state must have proved beyond a reasonable doubt that the defendant made a demand on the [victim] which the state claims was that the [victim] go to the defendant's house.* The defendant denies this.

"The second element the state must prove beyond a reasonable doubt is that the defendant induced [the victim] to do that thing that the defendant demanded and that she had the legal right to abstain or refuse from doing. Induce means to move to action by persuasion or influence. *Here, the state claims and must have proved beyond a reasonable doubt that the defendant induced the [victim] to come to 23 Eastwood Avenue.* Again, the defendant denies this." (Emphasis added.)

that he induced the victim to go to his apartment by means of an overt threat. Also, the defendant argues that there was no evidence that the victim had explicitly stated that she went to the defendant's apartment out of a sense of fear that the defendant would expose the images of her.

Our careful review of the victim's testimony reveals that the defendant initiated the telephone conversation between himself and the victim concerning the photographs and video; he conveyed to the victim that these images of her were intimate in nature. The victim testified that, the night before the defendant made this telephone call, the defendant had made romantic advances toward her and that she had rejected such advances. Also, the victim testified that she was shocked to learn about the images of her. The victim testified: "In short, I ended up going to his home because he said he wanted to show me this video, show me these pictures of me because he thought I might want to know and see them and he . . . was trying to protect me, trying to warn me about these photos. That he saw I was a good girl, that I was into church. . . . He said, you're a really good girl, so I think you'd want to see these. I think you'd want to know about this. If I was a grimy kind of person, I would just put them out there. I wouldn't show them to you, but I'd like you to see them." The victim testified that the defendant had picked her up at her home and that she had asked him to bring the images with him. The defendant replied: "[N]o, I have them at home. You can just see them at my house." The victim also testified that she went to the defendant's apartment, shortly before 1 a.m., while dressed in her pajamas, a hooded sweatshirt and sneakers.

Upon arriving at the defendant's apartment, the conversation between the victim and the defendant centered around the images that the defendant had claimed to have possessed. The victim recalled: "We went

upstairs to his apartment, but on the way there we were talking about these items that he had, and he was like . . . if he was a grimy person, he could get money off these things for what I was doing in this video, for the pictures that he had that were of me. That, you know, he could get money if he was a different kind of person."

It is not disputed that the victim had a right to abstain from going to the defendant's apartment. The defendant argues that the state was required to present evidence that he made an overt, rather than implied, threat to the victim. The defendant also argues that the state was required to present testimony from the victim, stating, in explicit language, that she had gone to the defendant's apartment out of a sense of fear. The defendant does not cite to any relevant basis in the law to support either of these contentions. Our review of the plain language of § 53a-192 (a) (3) as well as prior judicial interpretations of that enactment in no way supports them. We decline the defendant's invitation to heighten the state's burden of proof for this crime and will examine the evidence presented to determine whether, on the basis of the evidence and the rational inferences drawn therefrom, the jury reasonably could have found that the defendant committed the crime.

The state presented sufficient evidence from which the jury could find that the defendant invited the victim to go to his apartment and instilled a fear in her that, if she did not go to his apartment, he would expose the secret images of her. The defendant told the victim about these images late at night, when, by his own testimony, he was planning to pick her up and bring her to his apartment. The victim's testimony revealed that the defendant did not discuss these images in passing but told her that he needed to protect her and to warn her about them. Likewise, he clearly suggested that these images, depicting the victim in intimate poses, would damage her reputation as a "good girl."

Additionally, it was the defendant who mentioned his interest in releasing the images, stressing that he could have "just put them out there" for others to view, without affording her an opportunity to view them at his apartment. On the way to his apartment, the defendant reinforced his interest in exposing the images, noting that he could "get money" for them. Also, the defendant did not comply with the victim's request to bring the images to her but made clear that he would show them to the victim on his own terms, at his apartment. On the basis of the evidence and rational inferences drawn therefrom, the jury properly could have found that the defendant had a motivation to lie about the photographs and video and coerce the victim to come to his apartment; the defendant had been unsuccessful in winning the victim's affections through other legitimate means. On the basis of the evidence considered as a whole, it was reasonable for the jury to find that the defendant instilled a fear in the victim that if she did not accompany him to his apartment, he would expose the images.

Although the victim did not know anything about the images beyond the defendant's representations, there was nothing in the evidence to suggest that she went to the defendant's apartment during the early morning of March 14, 2006, for any reason other than to view the images and to protect her privacy. The victim testified that, immediately prior to taking the defendant's telephone call on the night in question, the defendant had called her twice. The victim recalled ignoring the defendant's first call. The victim also recalled that, after answering the second call, she told the defendant that she would call him back, although she did not intend to do so. It was only when the defendant called her a third time that she took the call and spoke with him. The jury reasonably could have inferred from this evidence that the victim did not intend to go to the defendant's apartment, but that the surprising subject of the

victim's ensuing conversation with the defendant had caused her to change her mind and to accompany him to his apartment.

The victim's testimony reflected her concern over the images that the defendant discussed with her. The evidence that the victim left her home, at a late hour, on the basis of the defendant's representations, reflected her concern and fear related to the images. Additionally, the victim recalled that she had annoyed the defendant by immediately and repeatedly asking him about the images upon arriving at his apartment. The evidence amply supported a finding that the victim was fearful that the defendant would expose the images and that this fear induced her to go to his apartment. Accordingly, we conclude that the evidence amply supported the jury's guilty verdict for the crime of coercion.

The judgment is affirmed.

In this opinion the other judges concurred.